IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WANDA AYERS,
      Plaintiff,

vs.                                    Case No. 3:05cv361/LAC/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

On June 15, 2000, Plaintiff filed an application for DIB under Title II (Tr. 89–91).[1]  The application was denied initially (Tr. 30–31, 44–45) and on reconsideration (Tr. 32–33, 48–49).  On March 29, 2002, following a hearing, an administrative law judge (ALJ) found that Plaintiff was not

_____

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on January 30, 2006 (Doc. 6).

under a "disability" as defined in the Social Security Act at any time when she met the insured status requirements of the law (Tr. 37–43).  On February 21, 2003, the Appeals Council of the Social Security Administration remanded Plaintiff's case for further consideration by an ALJ (Tr. 72–75). On February 9, 2004, after considering additional evidence and conducting a second administrative hearing, an ALJ found that Plaintiff was not under a "disability" as defined in the Social Security Act prior to May 22, 2003, but Plaintiff is disabled as of May 22, 2003 (Tr. 17–22).  On August 12, 2005, the Appeals Council denied Plaintiff's request for review (Tr. 7–10).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, and therefore subject to review in this court.  Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.  Plaintiff alleges that the ALJ erred in finding her disabled only as of May 22, 2003, instead of June 3, 1999, the alleged onset date of her disability.

II.     FINDINGS OF THE ALJ

On February 9, 2004, the ALJ made several findings relative to the issues raised in this appeal (Tr. 17–22):

    1)      Plaintiff alleged disability beginning June 3, 1999, and she meets the nondisability requirements for a period of disability and DIB set forth in Section 216(j) of the Act and is insured for benefits "at all relevant times."

    2)      Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.

    3)      Plaintiff has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b); however, these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

    4)      Beginning May 22, 2003, Plaintiff's allegations of pain and functional limitation are fully credible.

    5)      Beginning May 22, 2003, Plaintiff could perform no past relevant work or any work available in the national economy.

    6)      Prior to May 22, 2003, although Plaintiff had severe physical and mental impairments, she could perform unskilled light work.

7)     Prior to May 22, 2003, Plaintiff's allegations of pain and functional limitation were not fully credible or supported by the objective clinical evidence.

8)     Prior to May 22, 2003, Plaintiff was forty-nine years old, a "younger individual," with a high school education and one year of college.

9)     Plaintiff was not disabled prior to May 22, 2003, but as of that date, she was and is under a disability; thus, Plaintiff is entitled to a period of disability and to DIB under Title II of the Act commencing May 22, 2003.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

    A.    Personal History

    Plaintiff was born on July 1, 1953 (Tr. 94, 337).  She completed the twelfth grade, one year of college, and vocational training in cosmetology (Tr. 113, 337, 374).  She has worked in the past as a courier, car washer, reservationist, cashier, manager of a service station, hairdresser, and assistant manager of a beauty shop and a barber shop (Tr. 98).  She alleges that on February 6, 1998, while employed as a courier at Pensacola Junior College, she fell and injured her left knee and back (*see* Tr. 160).  After her fall, Plaintiff worked fewer hours and needed help with lifting, bending, and reaching (Tr. 107).  As of June 3, 1999, she could no longer work due to back pain that became "unbearable" (Tr. 107, 121).  Plaintiff underwent two back surgeries, one in September 1999 and one in May 2000.  Her surgeon prescribed pain medication and muscle relaxers (Tr. 109, 112).  In June 2000, Plaintiff weighed 185 pounds and was five feet, eight inches tall (Tr. 106, 115).  She stated that she had a "loss of feeling" in her right leg "all the way to [her] foot and toes" and that it "hurts so bad at times [she] can't hardly get out of bed" (Tr. 126).  Plaintiff noted that she prepares her own meals twice daily, but if she has to lift something heavy like a bag of potatoes, she needs assistance (Tr. 116).  She grocery shops, but she cannot lift groceries and gets tired and her back starts to hurt if she is "up very long" (Tr. 116).  Plaintiff performs household chores such as light cleaning, dusting, and laundry (although she needs help lifting a full basket of clothes), but she cannot vacuum, clean the bathtub, or mop due to pain, and she can no longer drive a standard automobile (Tr. 119, 123).  Plaintiff experiences pain when she bends, stands, walks, or sits, and she experiences pain daily, although medications ease the pain "a little for a short while" (Tr. 122).  She attempted physical therapy in 1999, but it did not help (Tr. 123).  Plaintiff also had injections (Tr. 343).  She reported in August 2001 that she supervises her six-year-old granddaughter for a couple of hours each afternoon when she gets home from school, although Plaintiff cannot pick her up or engage in activities she had ordinarily done prior to her injury (Tr. 260).  At Plaintiff's hearing in March 2002, she stated that she was presently using a TENS unit, which provides some pain relief (Tr. 333, 343–44).  However, Plaintiff testified that she cannot sit longer than fifteen minutes or stand longer than ten minutes without experiencing pain (Tr. 346).  Lying on her side helps alleviate the pain, and she must lie down three to four times a day in thirty-minute intervals (Tr. 347).  She

also experiences numbness in her right hip and leg, "all the way to [her] two smaller toes" (Tr. 348–49). At Plaintiff's second hearing before an ALJ, in October 2003, Plaintiff indicated that she weighed 240 pounds (Tr. 363, 376). She also testified that she can sit for thirty to forty-five minutes before having to stand, and that she can "stand comfortably" for fifteen minutes (Tr. 384, 388). Plaintiff began seeing a psychiatrist and a mental health counselor for depression after her injury, and she reported that medication "seems to help a lot" and she always feels good after meeting with the counselor (Tr. 344–45). Plaintiff noted that she gets along well with the public and people in authority, and she manages her own money (Tr. 117, 119).

B.      Relevant Medical History (Physical)

Following Plaintiff's injury, she was seen for an occupational rehabilitation evaluation, at which time it appeared that Plaintiff had pulled a muscle in her low back area (Tr. 146, 158, 160). It was also noted that Plaintiff had degenerative changes in the lumbosacral spine which showed increased disk degeneration since her prior radiological studies in 1996 (Tr. 158). However, Plaintiff was doing well, continued working, and was losing weight as recommended by her physician, although she was experiencing ongoing low back pain and intermittent lower extremity pain (Tr. 155, 158–60). A course of physical therapy was prescribed, but Plaintiff reported after two to four weeks of therapy that it was not effective (Tr. 160). In June 1999, Plaintiff reported a "marked flare up of her symptomatology," and she was placed in a nonworking status (Tr. 146). At that time she reported her low back pain to be at a six on a ten-point scale and her left lower extremity pain to be at a seven (*id.*). At another doctor's visit in June 1999, Plaintiff reported higher back pain, eight on a ten-point scale, and lower left lower extremity pain, five on a ten-point scale (*see* Tr. 149). MRI's revealed a moderate to severe L5-S1 degenerative disk with broad-based left lateralizing disk herniation and very limited caudal extension, as well as mild proximal left S1 nerve root displacement with moderate L5-S1 foraminal stenosis (Tr. 146).

On September 22, 1999, Plaintiff underwent L5-S1 bilateral hemilaminectomies and an L5-S1 diskectomey and cage fusion (Tr. 202). Dr. Paul T. Turner performed the surgery (*id.*). In March 2000, Dr. Turner noted that Plaintiff was "no longer making progress" and was complaining of increasingly painful symptoms, as well as light-headedness and fainting spells (Tr. 222). Dr. Turner

referred Plaintiff to another physician who gave Plaintiff a lumbar epidural steroid injection (Tr. 224).

On May 9, 2000, Dr. Turner performed a second surgery during which a pseudomeningocele was excised from just beneath L5 (Tr. 168–76). Plaintiff had been complaining of headaches which resolved with this second surgery, although Plaintiff continued to complain of back pain and soreness (Tr. 215). On May 22, 2000, Dr. Turner noted that Plaintiff had been out work for a year, and he advised her that "it would be reasonable to apply for Social Security Disability because it will be at best another year before she would be capable of competing with work activities" (*id.*). On October 16, 2000, Dr. Turner noticed satisfactory healing, but Plaintiff continued to complain of debilitating pain, and on October 20, 2000, Dr. Turner opined that Plaintiff was completely disabled from work and had been since July 1999 (Tr. 209–10). Dr. Turner further opined, in March 2001, that Plaintiff was becoming increasingly depressed as a result of her injury and pain (Tr. 251). He recommended that she be referred for psychiatric treatment (*id.*). He also again opined that Plaintiff was disabled, noting her continued pain, decreased range of motion in her lumbar spine, secondary musculoskeletal spasm, loss of reflex in her ankle, and sensory numbness in the distribution of the S1 nerve root (*id.*).

In April 2001, Dr. Turner completed a Physical Capacities Evaluation in which he opined that Plaintiff could sit, in forty-five-minute intervals, for a total of three hours in an eight-hour workday; stand, in twenty-minute intervals, for a total of one hour; and walk, in thirty-minute intervals, for a total of two hours (Tr. 253). He also found that Plaintiff could frequently lift or carry up to ten pounds, occasionally lift or carry up to twenty pounds, but never lift or carry more than twenty pounds (*id.*). She could use both hands for grasping, pushing and pulling of arm controls, and fine manipulation (*id.*). She could use her right foot for repetitive movements, but not her left, and she could occasionally bend and reach, but never squat, crawl or climb (*id.*). Finally, Dr. Turner opined that Plaintiff could never be around unprotected heights, she was moderately restricted from being around moving machinery and driving automobile equipment, and she was mildly restricted from being exposed to marked changes in temperature, humidity, dust, fumes, and gases (*id.*). On a Clinical Assessment of Pain form, also completed in April 2000, Dr. Turner opined that "pain is present to such an extent as to be distracting to adequate performance of daily activities or work"

and that physical activity will increase Plaintiff's pain "to such a degree as to cause distraction from, or abandonment of task" (Tr. 254).  Dr. Turner also noted that Plaintiff's prescribed medications would somewhat limit her ability to perform work, but "not to such a degree as to create serious problems in most instances" (Tr. 255).

Plaintiff saw Dr. Turner in August 2001, and she continued to report the same level of symptoms and activity (Tr. 327).  He continued to believe that Plaintiff was disabled "in terms of her Social Security criteria" and that there was "no other neurosurgical treatment that [could be] recommend[ed] at this point" (*id.*).  In November 2001, when Plaintiff next saw Dr. Turner, she complained of continued pain related to her low back and had no "relief from the unremitting symptoms in the last many months" (Tr. 296).  She stated that the pain is almost constant, even when she is still, although she stated that moving around will aggravate the pain (*id.*).  Dr. Turner reviewed Plaintiff's MRI scan, noting that it revealed "satisfactory placement and fusion, ongoing with the cages" and that overall the MRI scan looked good (*id.*).  Although Plaintiff reported that Dr. Chandler recommended a posterior fusion to augment her anterior fusion, Dr. Turner did not see any indication that Plaintiff needed further surgery (*id.*).

On December 3, 2001, Dr. Turner completed an "Estimated Functional Capacity Evaluation" (Tr. 291–92).  He opined that Plaintiff could never lift or carry more than ten pounds; never bend, climb, or reach above her shoulders; occasionally squat, crawl, and push or pull, whether sitting or standing; sit two hours in an eight-hour workday; stand or walk a half hour in an eight-hour workday; grasp and manipulate with both hands; and operate foot controls with her left foot (*id.*). He concluded that Plaintiff could not return to any former job or work at another job, as she was capable of only one and a half to two hours of sustained, sedentary work (Tr. 292).  Regarding pain, Dr. Turner opined that it would distract Plaintiff from adequately performing daily activities or work, and physical activity would greatly increase her pain to such a degree as to cause distraction from task or total abandonment; alternatively, he found that physical activity would increase Plaintiff's pain to such an extent that bed rest and/or medication would be necessary (Tr. 293).  He believed that Plaintiff's underlying medical condition was consistent with the pain she experiences (Tr. 294).

Finally, Plaintiff was treated by David LeMay, M.D., from February 26, 2003 to May 21, 2003, and again on August 20, 2003 (Tr. 322–25, 330).  In February, Plaintiff reported severe low back pain and a history of radicular pain and numbness in her right leg, thigh, and foot (Tr. 324). In May, Plaintiff reported swelling in her lower extremities and unchanged levels of pain (Tr. 323). Her medications were refilled, and she was advised to continue daily stretching (*id.*).  And in August, Dr. LeMay noted no change in her condition, and he advised Plaintiff to return in three months for followup (Tr. 330).

On May 21, 2003, Dr. LeMay opined that Plaintiff's "pain is present to such an extent as to be distracting to adequate performance of daily activities or work" and that physical activity will increase her pain "to such a degree as to cause distraction from, or abandonment of task" (Tr. 301). He also noted that Plaintiff's prescribed medications would somewhat limit her ability to perform work, but "not to such a degree as to create serious problems in most instances" (*id.*).  He further found that Plaintiff could sit, in one-hour increments, for a total of eight hours in a workday, and stand or walk, in approximate half-hour increments, for a total of two hours, without needing to recline or lie down "several times a day" (Tr. 307–08).  Plaintiff could frequently lift up to twenty pounds and use both hands and feet for different types of repetitive motion, although she would need to elevate her legs several times a day due to swelling in her lower extremities (Tr. 308).  He also found that Plaintiff could never bend or crawl, but she could occasionally squat, climb, and reach (Tr. 309).  She was moderately restricted from being around moving machinery, heights, and vibration; mildly restricted from driving automotive equipment; and had no restrictions related to exposure to dust, fumes, gases, temperature extremes or humidity (*id.*).  Finally, Dr. LeMay noted that Plaintiff's medications could cause mild drowsiness, that she would experience periods of exacerbation of her symptoms, and that her allegations were consistent with his clinical findings (Tr. 310).

C.      Relevant Medical History (Mental)

Plaintiff was referred to Raul Jimenez, M.D., for an evaluation for depression on July 3, 2001 (Tr. 263).  Plaintiff indicated that she had no mental health problems until after her injury (*id.*). Specifically, Plaintiff stated that she began experiencing symptoms of depression after her first back surgery, such as sadness, crying, difficulty sleeping, anhedonia, weight gain, irritability, anxiety, and

tiredness (*id.*).  Plaintiff was diagnosed with "major depressive disorder, single - moderate" (Tr. 264).  Dr. Jimenez prescribed Prozac and referred Plaintiff for individual psychotherapy (Tr. 262). In August 2001, Plaintiff reported experiencing headaches, and Dr. Jimenez decided that Plaintiff should discontinue her use of Prozac and start on Wellbutrin (Tr. 258).   Plaintiff again saw Dr. Jimenez on September 13, 2001 (Tr. 257).  Plaintiff reported that she was "doing fairly well" (*id.*). She also reported having more energy on Wellbutrin, but she noted that it wore off in the afternoon and she became tired; thus, Dr. Jimenez increased Plaintiff's dosage of Wellbutrin (*id.*).  He noted that Plaintiff's affect was brighter, although she continued to experience chronic pain (*id.*).  When he saw Plaintiff again, on October 18, 2001, Plaintiff reported that she was "doing fair" and crying less (Tr. 286).  She continued to have chronic pain, but her affect was fair (*id.*).  Her Wellbutrin was increased again (*id.*).  On November 12, 2001, Plaintiff reported "more pain and discomfort this last week than she can ever recall since her injury" (Tr. 282).

On November 13, 2001, Dr. Jimenez opined that Plaintiff "currently meets the Social Security guidelines listing impairment as detailed on 12.04 for affective disorders" and that he expected her condition to continue (Tr. 281).  Dr. Jimenez completed a Mental Residual Functional Capacities Evaluation on February 25, 2002 (Tr. 297–99).  He opined that Plaintiff has marked limitations in her ability to interact with others, in deterioration of personal habits, in constriction of interests, and in her ability to perform complex or varied tasks (Tr. 297–98).  He also noted that Plaintiff has constant failures in concentration, persistence, and pace, and continual episodes of deterioration (Tr. 297).  He indicated that Plaintiff has moderate limitations in interacting with others, performing simple or repetitive tasks, remembering and following instructions, performing work requiring frequent or minimal contact with others, and relating to authority figures (Tr. 298–99).  He also indicated marked limitations in Plaintiff's ability to perform varied or complex tasks (Tr. 298).

In May 2003, Dr. Jimenez found that Plaintiff's mental impairments had changed from his February 2002 evaluation.  For example, he again found that Plaintiff suffered marked limitations in her ability to interact with others, but he also found that Plaintiff now had only "often" failures in concentration, persistence, and pace (instead of "constant") and only "repeated" episodes of deterioration  (instead of "continual") (Tr. 304).  While he earlier found a "marked" degree of

deterioration in Plaintiff's personal habits, he now found only a "moderate" degree (*see* Tr. 297, 304).  He found that her ability to remember and follow instructions had worsened and was now "markedly" limited instead of "moderately" limited (*see* Tr. 298, 305).  Additionally, Plaintiff's limitations relating to the performance of complex or varied tasks worsened from "marked" to "severe," and her limitations relating to the performance of repetitive tasks and her ability to relate to authority figures worsened from "moderate" to "marked" (Tr. 298–99, 305–06).

Plaintiff first met with Susan Lightfoot, R.N., M.A., L.M.H.C., on August 9, 2001, for an individual counseling session (Tr. 260). Ms. Lightfoot noted that Plaintiff was anhedonic, and stated that Plaintiff would have trouble with motivation until the Prozac started having an effect (Tr. 261). Plaintiff was assessed with chronic pain and major depression, single episode (*id.*).  Ms. Lightfoot saw Plaintiff again on August 30, 2001, at which time Dr. Jimenez authorized changing Plaintiff's medication from Prozac to Wellbutrin (Tr. 258).  In September 2001, Plaintiff reported doing "much better on Wellbutrin," she was "tolerating it fairly well overall," she had no more headaches since discontinuing the Prozac, she "look[ed] and sound[ed] improved," and she "clearly" was benefitting from the Wellbutrin, although she continued to experience chronic pain (Tr. 289).  Plaintiff reported her ability to be more assertive and to set limits (*id.*).  Similarly, on October 4, 2001, Plaintiff reported setting limits "where friends asked her to babysit their children" (Tr. 287).  She also reported that medication side effects had subsided, she was tolerating the medication well, and she felt that it had helped with her mood and "general coping ability" (*id.*).  On October 25, 2001, Plaintiff saw Ms. Lightfoot again and reported increased pain, noting that it was interfering with her sleep (Tr. 284–85).

D.      Other Information Within Plaintiff's Claim File (Physical)

Plaintiff was examined by a consultative examiner on September 5, 2000.  At that time Plaintiff weighed 240 pounds.  Dr. Wendell J. Newcomb observed that Plaintiff had a good grip in both of her hands and could bend forward approximately 20 degrees (Tr. 177).  Plaintiff had active reflexes in both knees, but decreased reflexes in her ankles and some atrophy in her right leg (*id.*). Plaintiff's cervical spine range of motion was within normal limits, and she had no limitations in the range of motion in her shoulders, elbows, wrists, hands, hips, knees, ankles, feet, and great toes (Tr. 179–81, 183–86).  However, Plaintiff's thoracolumbar spine range of motion was limited (*see* Tr.

179, 182).  Dr. Newcomb commented on Plaintiff's gait and station as follows: "Patient uses the lower extremities adequately.  Gait and motion and straight leg raise [are] not abnormal.  Back motion markedly limited. . . . Some mild weakness in right leg.  The calf is the same size of left, but motions and action equal to left.  Problem here is mostly back pain." (Tr. 182, 186).

David Guttman, M.D., completed a Physical RFC Assessment on September 14, 2000 (Tr. 187–94).  He opined that Plaintiff was able to frequently lift and/or carry ten pounds, occasionally lift and/or carry twenty pounds, and she could stand, walk or sit for six hours in an eight-hour workday (Tr. 188).[2]  Her ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to climb, balance, stoop, kneel, crouch, and crawl (Tr. 189).   No manipulative, visual, communicative, or environmental limitations were established (Tr. 190–91).

A second RFC assessment was conducted on December 1, 2000 (Tr. 241–48).  This physician reached the same conclusions as Dr. Guttman (*id.*).

On October 12, 2001, a consulting orthopedic surgeon, Dr. Chandler, reported that Plaintiff could lift twenty pounds (Tr. 266).  He indicated an impairment rating of 11 percent of the whole person (*id.*).  He further opined that Plaintiff was capable of sedentary or light duty work with a lift/carry restriction of twenty pounds (Tr. 274).  However, he also noted that Plaintiff did "not actually appear to be employable at this time," and that if she did work, she should not be required to stand, walk, or sit for more than a brief period (*id.*).

E.      Other Information Within Plaintiff's Claim File (Mental)

Plaintiff was referred by the Division of Disability Determinations to A. Mitch Cooper, Ph.D., for an evaluation on May 15, 2003 (Tr. 315).  His diagnostic impression was "Major Depressive Disorder, Single Episode, Severe, without psychotic features," and his prognosis was as follows:

> Her prognosis is guarded.  Her medications have improved her depression to some extent, but she still has significant levels of depression.  She was benefitting from individual psychotherapy but can no longer afford this.  I think her general day to day level of functioning could be improved by regular psychotherapy if that could

---

[2]"Frequently" means occurring $1/3^{rd}$ to $2/3^{rds}$ of an 8-hour workday (cumulative, not continuous). "Occasionally" means occurring from very little, up to $1/3^{rd}$ of an 8-hour workday (cumulative, not continuous).

be arranged.  Her depression is largely reactive in nature as a response to the underlying chronic pain and limited activities that have resulted in a drastic change in lifestyles.  She is having difficulty adjusting to these significant changes.

(Tr. 318).

Dr. Cooper found that Plaintiff's ability to remember and carry out instructions was not affected at all by her impairment or only slightly affected in some areas (Tr. 320).  Additionally, he opined that Plaintiff had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers, and moderate limitations in her ability to respond appropriately to work pressures and changes in a routine work setting (Tr. 321).  However, Dr. Cooper found that no other capabilities were affected by Plaintiff's impairment (*id.*).

V.    DISCUSSION

Plaintiff contends that the ALJ erred in finding her disabled as of May 22, 2003, instead of June 3, 1999, the date she alleged she became disabled.  Specifically, Plaintiff alleges that the ALJ failed to accord proper weight to Plaintiff's treating physicians, improperly substituted his own opinion for that of Plaintiff's treating psychiatrist, and failed to follow the Eleventh Circuit pain standard in evaluating Plaintiff's credibility (Doc. 8 at 3).

A.    Treating Physicians

Plaintiff alleges that Defendant failed to give controlling weight to the opinion of Dr. Jimenez, who opined that Plaintiff met Listing 12.04; "completely ignored" the opinions of Dr. Turner, Plaintiff's back surgeon and treating physician; and failed to properly evaluate the opinion of Dr. LeMay, another of Plaintiff's treating physicians (Doc. 8 at 3).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence

or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

(i)    Dr. Jimenez

The ALJ acknowledged Dr. Jimenez's opinion that Plaintiff's mental impairment met Listing 12.04, but he ultimately concluded that Plaintiff did not meet the Listing prior to May 2003.

The listing of impairments found at 20 C.F.R., Part 404, Subpart P, Appendix 1, "describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any substantial gainful activity." 20 C.F.R. § 404.1525(a). "A claimant may

prove that he is disabled by either (1) *meet*ing the listings or (2) *equal*ing the listings." <u>Wilkinson o/b/o Wilkinson v. Bowen</u>, 847 F.2d 660, 662 (11th Cir. 1987).  "In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement." *Id.*  A diagnosis alone is insufficient. *Id.* (citing 20 C.F.R. § 416.925(c)–(d)).  In order to *equal* a listing, the medical findings must be at least equal in severity and duration to the listed findings.  *Id.*

The listings for mental disorders are arranged in nine diagnostic categories, including affective disorders,[3] which is section (or "listing") 12.04.  Listing 12.04 contains an introductory paragraph with the diagnostic description for affective disorders.  It also contains paragraph A criteria (a set of medical findings) and paragraph B criteria (a set of impairment-related functional limitations).  Additionally, Listing 12.04 contains paragraph C criteria, which are functional criteria specific to that listing.  A claimant will be found to have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B are satisfied; alternatively, the criteria in paragraph C may be satisfied.

In the instant case, the ALJ noted Dr. Jimenez's opinion that Plaintiff met Listing 12.04, but he concluded that Dr. Jimenez "overestimated, to a degree, the amount of limitation that [Plaintiff] experiences based upon her mental pathology" and that Dr. Jimenez's opinion is inconsistent with the record (Tr. 19, 40[4]).

In support of his finding, the ALJ noted that in September 2001 Plaintiff told Dr. Jimenez and her counselor that she was "doing fairly well" and "much better" on Wellbutrin (Tr. 40, 257, 289).  On August 7, 2001, Plaintiff reported that she was doing "fair" (Tr. 262).  In October 2001, she reported crying less and agreed to increase her dosage of medication (Tr. 286).  On November 19, 2001, although Plaintiff reported continued depression, she indicated that Wellbutrin helped her

---

[3]Disorders characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.

[4]The specific finding that Dr. Jimenez's opinion is inconsistent with the record was made by the ALJ who presided over Plaintiff's first hearing; however, the second ALJ (who rendered the opinion that is the subject of the instant appeal) noted that the first ALJ's decision was being "incorporate[d] by reference" into his decision (*see* Tr. 17).

symptoms of anxiety and Effexor3 was prescribed (Tr. 280).  Therefore, the ALJ found that the evidence did not support Dr. Jimenez's assessment that, <u>prior to 2003</u>, Plaintiff met Listing 12.04 (Tr. 17, 40, 281, 297–99, 304–06, 329).

      The record supports the ALJ's finding that Plaintiff responded favorably to medications; it also demonstrates that the types and dosages of Plaintiff's medications were altered to address any negative side effects or deficiencies in their effectiveness.  Additionally, although Dr. Jimenez first opined that Plaintiff met Listing 12.04 on November 13, 2001, he did not provide a rationale for his opinion (*see* Tr. 281).  Thus, his 2001 opinion is wholly conclusory.  In May 2002 and May 2003, Dr. Jimenez again found that Plaintiff met the Listing, but on these occasions he noted that Plaintiff satisfied the "B" criteria of Listing 12.04 (i.e., marked restrictions or difficulties in certain functional areas and/or repeated episodes of decompensation) (*see* Tr. 297–98, 304–06).  However, the limitations he assessed were inconsistent with Plaintiff's own description of her limitations in 2002 (as discussed more fully below).  Moreover, Dr. Jimenez noted that some areas of functioning had improved between May 2002 and May 2003, and others had worsened.  Nevertheless, although Plaintiff initially responded well to therapy and reported progress on her medications, she ultimately reached a point where, the ALJ concluded, her condition satisfied the criteria of Listing 12.04.  The ALJ chose to draw this line on May 22, 2003 — as that is when Dr. Jimenez assessed Plaintiff with the most severe restrictions overall.  Based on a review of the entire record, this court cannot find that the ALJ erred in this regard.

      Plaintiff insists that she was mentally disabled as of June 1999, but by her own admission she had no mental health issues until after her first back surgery, which was in September 1999. Moreover, when Plaintiff applied for benefits in June 2000, she was asked to state the conditions that limit her ability to work (*see* Tr. 107).  Plaintiff responded by reporting only her back injury and related pain (*id.*).  Additionally, in August 2000, Plaintiff reported that she gets along with people in authority; gets along well with the public; is able to concentrate on what she is doing; has good recent and remote memory, although she "sometimes [] forgets things that ha[ve] happened in the past"; can follow written or spoken instructions; and can deal with deadlines or schedules (Tr. 120–21).  She also reported in August 2000 that her ability to work was impacted only by her pain, and again made no mention of any mental impairment that might affect her ability to work (Tr. 124).

Furthermore, Plaintiff testified at her hearing in March 2002 that her medication "seems to help a lot," and she always feels good after meeting with the counselor (Tr. 344). Thus, Plaintiff's own description of her mental status, capabilities, and work-related limitations is inconsistent with a finding that she was mentally disabled as of June 1999. Moreover, Plaintiff clearly did not become "disabled" immediately. For example, Dr. Turner noted in March 2001 that Plaintiff was becoming "increasingly depressed," and he recommended that she be referred for psychiatric treatment (Tr. 251). Thus, the record demonstrates that Plaintiff's symptoms worsened over time, and the ALJ selected a date on which it was evident that she met the Listing. The ALJ did not err, as there is substantial support in the record for his decision, especially considering the opinion of Dr. Cooper, also rendered in May 2003, that Plaintiff's ability to remember and carry out instructions was not affected at all by her impairment or only slightly affected in some areas, and she had only moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers or to respond appropriately to work pressures and changes in a routine work setting (Tr. 320–21). Dr. Cooper further found that no other capabilities were affected by Plaintiff's impairment (Tr. 321). Although the ALJ noted that Dr. Cooper's opinion may not have accurately reflected the severity of Plaintiff's symptoms, and he assigned the opinion less weight than that of Dr. Jimenez (*see* Tr. 20), he considered this opinion in determining that Plaintiff became disabled as of May 22, 2003. Accordingly, the ALJ did not err in discounting the earlier opinions of Dr. Jimenez and finding Plaintiff disabled as of May 22, 2003 — as it relates to Plaintiff's mental impairment.

        (ii)     Dr. Turner

Dr. Turner was Plaintiff's long-term treating physician and performed both of her back surgeries. Plaintiff alleges that the ALJ totally ignored "the entire volume of [Dr. Turner's] records," including Dr. Turner's opinion that Plaintiff was disabled, and that this "in itself should be grounds for reversal" (Doc. 8 at 12).

Although the more recent decision of the ALJ contains no detailed analysis of Dr. Turner's records (*see* Tr. 17–22), the prior decision of ALJ was incorporated by reference into the newer decision (*see* Tr. 17, 37–43), and the prior decision discusses Dr. Turner's records and opinions; therefore, this court will look to the earlier decision in analyzing Plaintiff's instant claim regarding Dr. Turner.

The ALJ noted Dr. Turner's opinion that Plaintiff was disabled (Tr. 39); however, he discounted the opinion.  In discounting the opinion, the ALJ noted that Dr. Turner "changed his opinion numerous times," that the restrictions he reported "are entirely inconsistent with the medical record," that his "opinion is overly restrictive," and that he "appears to have based his opinion entirely on subjective complaints, changing his opinions according to [Plaintiff's] changing beliefs regarding her limitations" (Tr. 39).

First, the ALJ noted that Dr. Turner's opinion changed on different occasions.  In support, he noted that on one occasion Dr. Turner opined that Plaintiff could sit for two hours in an eight-hour workday, but on another occasion he opined that she could sit for four hours in an eight-hour workday (Tr. 39).  A review of the record reveals that Dr. Turner reported in April 2001 that Plaintiff could sit for a total of three hours in a workday; in October 2001 he reported that she could sit for four hours in a workday; and in December 2001, he estimated that Plaintiff could sit for two hours in a workday (Tr. 253, 275, 292).  Additionally, as noted by the ALJ, in April 2001 Dr. Turner found that Plaintiff could never squat or crawl, but on another occasion he found that she could occasionally squat or crawl (Tr. 39, 253, 291).  Finally, in April 2001 Dr. Turner found that Plaintiff could never lift or carry more than twenty pounds, but in December 2001 he found that Plaintiff could lift or carry no more than ten pounds (Tr. 253, 291).  Thus, the record supports the ALJ's finding that Dr. Turner offered inconsistent opinions regarding Plaintiff's abilities.  However, the court notes that these are relatively minor inconsistencies, and that, overall, Dr. Turner's opinion remained consistent regarding Plaintiff's limitations and credibility.

Second, the ALJ noted that Dr. Turner's restrictions were "entirely inconsistent" with the medical record, but the ALJ offered no explanation or examples of the inconsistencies.  The court's own review of the record reveals inconsistencies between the opinions of Dr. Turner and the consulting physicians; however, Dr. Turner's opinion is entitled to greater weight, as he was Plaintiff's treating physician and surgeon.  Additionally, he is a specialist in the field.  Title 20 C.F.R. § 404.1527(d)(5) provides that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  Moreover, Dr. Turner's opinion is consistent with that of Dr. LeMay, who treated Plaintiff after Dr. Turner's retirement and who also opined that Plaintiff was disabled.

Third, the ALJ noted that Dr. Turner appeared to have based his opinion entirely on Plaintiff's subjective complaints and noted that the only objective finding cited by Dr. Turner was Plaintiff's "right leg strength reduced to 4/5" (Tr. 40). However, as Plaintiff's treating physician and surgeon, Dr. Turner was clearly aware of objective evidence confirming the severity of Plaintiff's conditions, including her MRI's, both before and after her surgeries. Additionally, Dr. Turner specifically noted his observation of Plaintiff's decreased range of motion in her lumbar spine, musculoskeletal spasm, loss of reflex in her right ankle, and sensory numbness in the distribution of the S1 nerve root (Tr. 251). Thus, it is evident that Dr. Turner's opinion was based upon more than Plaintiff's subjective complaints, and the ALJ erred in making a contrary finding.

In sum, only one of the ALJ's reasons for failing to assign substantial weight to Dr. Turner's opinion is supported by the record. However, that one reason, standing alone, does not constitute good cause for rejecting Dr. Turner's opinion, and the ALJ erred in so doing.

(iii)   Dr. LeMay

Plaintiff asserts that Dr. LeMay's records support a finding of disability prior to May 2003, and the ALJ provided no rationale for finding Plaintiff disabled only as of May 22, 2003 (Doc. 8 at 12).

The ALJ noted Dr. LeMay's opinion, rendered on May 21, 2003, that Plaintiff's pain prevented her from working (Tr. 18, 301–02). He fully accepted this opinion and found Plaintiff disabled as of the following day. Plaintiff asserts that the ALJ erred because he failed to demonstrate why Dr. LeMay's "records prior to that date (which essentially show the same exact thing — severe back pain, treated with pain medication and not improving) should be discounted up until May, 2003" (Doc. 8 at 12).

Dr. LeMay's records reflect office visits on only three occasions:  February 26, 2003, May 21, 2003, and August 20, 2003, at which time Plaintiff was advised to return for followup in three months (*see* Tr. 322–25, 330). However, it appears that Plaintiff was a patient of Dr. LeMay for a longer period of time, because the record dated February 26, 2003 states that Plaintiff "returns for followup regarding her low back pain and history of chronic radicular pain" (Tr. 324). It also appears that Dr. LeMay became Plaintiff's treating physician after Dr. Turner retired from practicing

medicine and that Dr. LeMay had reviewed Dr. Turner's records (*see* Tr. 324, 342).  For example, on February 26, 2003, Dr. LeMay noted that Plaintiff had "multiple surgeries done on her back by Dr. Turner who felt that she was permanently and totally disabled and not able to work because of her injuries" (Tr. 324).  Dr. LeMay also stated that Plaintiff was "still unable to drive, and cannot tolerate sitting or standing for long periods of time," and she had "no change in the severe pain in her back" (*id.*).  Additionally, on February 26, 2003, Dr. LeMay's impression or diagnosis was noted to be "history of multiple low back surgeries with failed back syndrome [and] ongoing radicular pain," and Dr. LeMay opined that disability benefits were "appropriate" (*id.*).  Thus, the ALJ has offered no justification for setting Plaintiff's disability date at May 22, 2003 (insofar as Dr. LeMay's records are concerned), as Dr. LeMay's opinion was fully accepted by the ALJ, but Dr. LeMay found Plaintiff disabled <u>at least</u> as of February 26, 2003, if not earlier.  Indeed, the record suggests that Dr. LeMay fully concurred with Dr. Turner's opinion that Plaintiff was and had been disabled.

Accordingly, this court finds that the ALJ failed to articulate good cause for failing to assign substantial weight to the opinion of Dr. Turner (and Dr. LeMay — to the extent the ALJ accepted Dr. LeMay's opinion only as of May 22, 2003).  Moreover, the opinions are well supported by objective medical evidence and are not inconsistent with other <u>substantial</u> evidence in the record; therefore, the opinions are entitled to controlling weight, and combined, they establish disability as of June 3, 1999, as alleged by Plaintiff.

B.      Eleventh Circuit Pain Standard

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor v. Bowen, 786 F.2d 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of

the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[5]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, supra, at 1548–49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ found Plaintiff's complaints of debilitating pain to be less than credible because her daily activities are "inconsistent with the degree of pain alleged" (Tr. 41).  In support, the ALJ noted that Plaintiff "manages to use the computer, attend church, do laundry, cook, dust, care for her personal needs, and make the beds" (Tr. 41).  However, Plaintiff indicated that she was able to perform only light housework, such as dusting or laundry, but she could not lift a basket of clothes, vacuum, clean the bathtub, or mop due to pain (Tr. 119, 123).  She also stated that she must lie down three to four times a day in thirty-minute intervals (Tr. 347).

It is appropriate for the ALJ to consider a plaintiff's daily activities.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  If daily activities are to be considered, however, the ALJ must do so in the context of all of the evidence in the record:

> We have consistently held that in ascertaining whether the [Commissioner's] findings are supported by substantial evidence, we do not consider only those parts of the record that support those findings, but rather must "view the entire record and

---

[5]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

take account of evidence in the record which detracts from the evidence relied on by
the [Commissioner]."

Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).  The Parker court found the ALJ's reliance
upon plaintiff's "daily activities" to discount her testimony as to pain to have been flawed for failure
to consider the plaintiff's testimony that she had to lie down after two hours of such work.  *Id.*
Similarly, in Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995), the court held that a conclusory
citation to a plaintiff's "daily activities" as a basis for failing to believe her testimony as to pain was
insufficient where there was a medical condition that reasonably could have given rise to the pain
described, and, although she testified that she cooked and shopped for herself, she had trouble
putting on her clothing.  Fiinally, in Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the
court held that participation in "everyday activities of short duration, such as housework or fishing,"
does not disqualify a plaintiff from disability, so long as such activities are not inconsistent with
limitations recommended by the treating physicians.

Here, the ALJ made a conclusory citation to Plaintiff's daily activities as the sole
justification for discounting her testimony.  However, as in Foote, Plaintiff indicated that her ability
to perform the activities was limited by her pain and that she needed to lie down often to control her
pain.  Additionally, the record reflects Plaintiff's significant weight gain (that is, from 185 pounds
to 240 pounds) following her surgeries, which is entirely consistent with Plaintiff testimony that she
could no longer participate in the same activities as before.  Dr. Cooper also noted Plaintiff's
"chronic pain and limited activities that have resulted in a drastic change in lifestyles" (Tr. 318).
Moreover, the record is replete with Plaintiff's unwavering complaints of pain, as well as evidence
of her underlying medical condition that could reasonably be expected to give rise to the pain she
alleged.  Moreover, Dr. Turner opined that Plaintiff's underlying medical condition was consistent
the pain she alleged, and similarly, Dr. LeMay noted that Plaintiff's allegations were consistent with
his clinical findings.  Finally, it is unclear why the ALJ found Plaintiff's complaints less than
credible before May 22, 2003, but found them credible after that date, when her complaints and daily
activities were basically consistent throughout the period under adjudication.  Thus, the ALJ failed
to properly discredit Plaintiff's complaints of pain, and as a matter of law, this court must find that
he accepted Plaintiff's complaints as true.

VI.   CONCLUSION

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223–24 (11th Cir. 1991).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  <u>Davis</u>, 985 F.2d at 534; *see also* <u>Bowen v. Heckler</u>, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1219 (11th Cir. 1991) ("The record . . . is fully developed and there is no need to remand for additional evidence."); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216–17 (11th Cir. 1991); (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

In the instant case, the cumulative effect of the evidence, including Plaintiff's complaints of pain and the opinions of Dr. Turner and Dr. LeMay, establishes that Plaintiff is disabled without any doubt and entitled to an award of benefits as of June 3, 1999.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that this action be **REMANDED** to the Commissioner to enter a finding of total disability and award disability benefits as of June 3, 1999, and that the clerk be directed to close the file.

At Pensacola, Florida this 24<u>th</u> day of January 2007.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

 Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; **United States v. Roberts**, 858 F.2d 698, 701 (11th Cir. 1988).